(No. 14240.—Decree affirmed.)

W. E. VOLLINTINE *et al.* Appellants, *vs.* MARY BELLE VOL-
LINTINE, Appellee.

*Opinion filed December 22, 1921—Rehearing denied Feb. 10, 1922.*

WILLS—*when verdict in favor of validity of a will will not be
disturbed on appeal.* A verdict sustaining a will contested on the
grounds of mental incapacity of the testatrix and undue influence
will not be disturbed on appeal, where there is no evidence in the
record of undue influence and where the evidence on the question
of mental incapacity, outside of testimony of the scrivener and the
attesting witnesses, is fairly evenly balanced and the testimony of
the scrivener and the attesting witnesses is in favor of the valid-
ity of the will.

APPEAL from the Circuit Court of Christian county;
the Hon. WILLIAM B. WRIGHT, Judge, presiding.

JOHN E. HOGAN, and LEAL W. REESE, for appellants.

WALTER M. PROVINE, and HARRY B. HERSHEY, for
appellee.

Mr. JUSTICE THOMPSON delivered the opinion of the
court:

February 25, 1920, appellants filed their bill in the cir-
cuit court of Christian county to set aside the will of Emma
L. Vollintine, deceased, on the grounds of mental incom-
petency and undue influence exercised by appellee, Mary
Belle Vollintine. A trial was had and the jury returned
a verdict finding that the writing purporting to be the last
will of Emma L. Vollintine was her last will, and answer-
ing in the affirmative the following special interrogatory,
"Was she at the time of making and executing the instru-
ment in question purporting to be her last will of sound
mind and memory?" and answering in the negative the
additional interrogatory, "Was the execution of the paper
alleged to be the last will and testament of Emma L. Vol-

lintine, deceased, obtained by fraud and undue influence?"
For some reason not appearing in this record, and with
which we are not concerned, the chancellor granted a new
trial. Upon the new trial the same issues were again sub-
mitted to a jury with the same result. This appeal is prose-
cuted to review the decree entered on that verdict.

Appellee, the sole beneficiary under the will in question,
was a sister and life-long companion of testatrix. Neither
had ever been married, so the heirs-at-law of testatrix were
her six brothers and sisters and nieces and nephews, chil-
dren of two deceased sisters. The property conveyed by
the will in question was property received from the estate
of the father of testatrix. At the time of his death six of
his children were married and had left the parental home.
Shortly after his father's death appellant W. E. Vollintine
was married and moved away from the old homestead, leav-
ing testatrix and appellee as its only occupants. The fam-
ily estate was partitioned and there was set off to each of
the children in severalty their respective shares. Appellee
and testatrix each received about eighty acres of land. Sep-
tember 2, 1912, they conveyed by deeds, one to the other,
their respective lands, so that thereafter they held their
combined portions as tenants in common. They continued
to live on the home place and managed and controlled their
real estate until the spring of 1918, when they leased the
farm and moved to Taylorville, where they occupied rooms
leased from Mr. and Mrs. A. J. Willey, the latter a sister.
On December 10, 1918, testatrix executed the will here in
question. She was then about sixty years of age. In May,
1919, she became so broken in health that she was removed
to a hospital in Taylorville, where she remained until her
death, October 1, 1919.

Twenty-eight acquaintances and neighbors of testatrix
testified on behalf of contestants that they noticed a great
change in testatrix's physical and mental condition during
the years 1918 and 1919; that she became very untidy in

dress; that she was forgetful; that she became lost in a neighborhood with which she was familiar and could not locate herself; that she could not carry on an intelligent conversation and would forget the subject about which she was talking; that she did not recognize old friends and acquaintances; and that in their opinion she was not of sound mind and memory December 10, 1918, and was not then capable of making an intelligent disposition of her property by will. On the other hand, forty friends and neighbors of testatrix testified that prior to May, 1919, they had noticed no particular change in the mental condition of the testatrix; that she recognized them and talked with them about current events; that she transacted business with them intelligently, and that it was their opinion that she was of sound mind and memory December 10, 1918, and that she understood fully the extent and nature of her property and knew the natural objects of her bounty.

Three physicians testified on behalf of the contestants. Dr. Morton testified that he treated testatrix for several weeks in 1916; that she was then suffering from organic kidney lesion and as a result had high blood pressure; that this disease caused hardening of the arteries; that her trouble was chronic and that the disease had been progressing for many years and was incurable, and that it was reasonable to expect that the mental faculties would be impaired before death. He did not express any opinion as to her mental condition in December, 1918. Dr. Solliday testified that he began treating testatrix October 16, 1918, and that he continued to treat her until she died; that his first acquaintance with her was when she came to his office accompanied by appellee; that he made an examination of her for the purpose of diagnosis and learned from her and her sister what he could of the history of her trouble; that he found her blood pressure 244, whereas normal blood pressure should have been about 150; that he found her suffering from a breaking-down of the arteries and from

heart lesion; that he attempted to talk to her but was not able to secure intelligent answers; that she was not able to stand erect or to walk straight, and that it was his opinion that her disease was progressive and had been six or seven years in formation and that it continued to grow worse until her death. It was his opinion that she was not of sound mind and memory October 16, 1918, nor at any time thereafter. Dr. Norbury, an eminent nerve specialist, was called in consultation. He testified that he saw her first June 5, 1919, at St. Vincent Hospital, in Taylorville; that she had paralysis involving the speech and the right arm and hand; that she could not control her bladder or bowels; that her blood pressure was 186; that she had organic disease of the brain, which affected the brain tissues; that her disease was progressive and had been from ten to fifteen years in formation; that in his opinion she was not of sound mind and memory December 10, 1918, and that he based his opinion on his examination of the patient in the summer of 1919, on the history of the case given him by Dr. Solliday, and on his general knowledge of the effects of the disease from which she was suffering.

Two physicians testified on behalf of appellee. Dr. Taylor, of Springfield, went to Taylorville in March, 1919, for the purpose of seeing testatrix. At that time he found her suffering from partial paralysis of one side but found her rational. Some three or four months previous to his visit to Taylorville the testatrix had visited him at his office in Springfield. He testified that she had suffered for some years with kidney trouble and arteriosclerosis; that both diseases were progressive in their nature; that mental impairment was a frequent result, and, in fact, the rule in a vast majority of cases, but that it came earlier in some cases than in others. Dr. Taylor had treated testatrix at intervals from 1915, and he expressed the opinion that her mind was sound when he saw her in March, 1919, and that there was no serious mental impairment at any time when

he saw her between 1915 and 1919. Dr. Roberts, an osteo-pathic physician of Taylorville, testified that he treated tes-tatrix in June, September and December, 1918; that she was suffering from high blood pressure, which might have been caused by kidney trouble or hardening of the arteries; that she was suffering from a general breakdown of the nervous system and was in a general weakened condition; that there was spine lesion, which interferes with the ner-vous system; that the disease progressed and that she was weaker in December than in June, but that in his opinion she was a person of sound mind in December, 1918.

William M. Provine, an attorney of Taylorville who had from time to time rendered professional services to the different members of the Vollintine family, testified that he had written a will for testatrix in 1917 and that he kept it for her in a safe in his office; that December 10, 1918, she came to his office, on the second floor of the Provine building, and asked him if she could make a new will giv-ing all her property to one person, and that he told her she could; that she requested him to write a new will giving all her property to her sister Belle; that he dictated the will and read it over to her after it was transcribed; that she requested him to call his son, so that he and the son could witness the will; that he told her his son was out of town; that she said she would take the will to the Farmers National Bank and have it witnessed; that the bank was about two and a half blocks from his office; that she took the old and the new will and left the office; that she came to the office alone and that nothing was said about anyone having suggested that she come, and that in his opinion she was of sound mind and memory and under no restraint.

James A. Adams testified that he was president of the Farmers National Bank of Taylorville; that December 10, 1918, testatrix came into his bank alone and called him into the back room; that she said she had her will with her and wanted him and someone else to act as witnesses; that he

called the cashier and that she made the same statement to him; that she then signed the will and stated that it was her will and asked them to sign it as witnesses; that they signed it; that she then asked him if he would keep it for her; that he put it in an envelope, which he sealed and on which he indorsed that it was her will; that he filed the envelope in the safe; that she left alone; that a few days later she called him and asked him to deliver the will to Provine's law office; that he did so; that some time later he met her on the street; that she was alone; that she stopped him and thanked him for what he had done; that he had known her for many years; that she had been a customer at his bank; that he had had many banking and business transactions with her, and that in his opinion she was a person of sound mind and memory December 10, 1918.

Floyd F. Baughman, cashier of the bank, gave testimony regarding the witnessing of the will corresponding with that of Adams. He had been acquainted with testatrix for many years and testified that in his opinion she was a person of sound mind and memory on the day the will was executed.

We think it manifest from the foregoing facts shown by this record that testatrix had sufficient mental capacity to make and publish this simple will. It certainly requires no argument or citation of authorities to demonstrate that this court could not, in view of the record, hold that the jury's verdict was manifestly against the weight of the evidence. There is no evidence in the record of undue influence. Excluding the testimony of the scrivener and the attesting witnesses and construing the evidence in a light most favorable to appellants, the most that can reasonably be said is that the evidence is conflicting and fairly evenly balanced, and that the verdict of the jury that heard and saw the witnesses will not be disturbed. Throwing into the balance the testimony of the scrivener and the attesting witnesses in favor of the validity of the will, the jury could

301—16

have reached but one conclusion in view of the record, and that conclusion is the one they have reached.

The record is free from substantial error in the rulings of the court on the admission and exclusion of evidence and the giving and refusing of instructions. The decree is therefore affirmed.                    *Decree affirmed.*